Andrew L. Packard (Bar No. 168690)
E-mail: Andrew@packardlawoffices.com
Megan E. Truxillo (Bar No. 275746)
E-mail: Megan@packardlawoffices.com
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

Margaret Morgan Hall (Bar No. 293699)
Email: Mhall@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
906 Garden Street
Santa Barbara, California 93101
Tel: (805) 963-1622
Fax: (805) 962-3152
Brian Segee (Bar No. 200795)
Email: bsegee@environmentaldefensecenter.org
ENVIRONMENTAL DEFENSE CENTER
840 County Square Drive
Ventura, California 93003
Tel: (805) 658-2688
Fax: (805) 648-8092

Attorneys for Plaintiff
ENVIRONMENTAL DEFENSE CENTER

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, and ENVIRONMENTAL DEFENSE CENTER, a non-profit corporation, <br><br> Plaintiffs, | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** |

vs.

A-1 METALS & AUTO SALVAGE,
INC., MICHAEL THOMPSON and
SHERYL  THOMPSON,
                    Defendants.

(Federal Water Pollution Control Act,
33 U.S.C. §§ 1251–1387)

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") and ENVIRONMENTAL DEFENSE CENTER ("EDC"), by and through their counsel, hereby allege:

## I.      JURISDICTION AND VENUE

1.      This is a civil suit brought under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (the "Clean Water Act", the "CWA" or "the Act") against A-1 METALS & AUTO SALVAGE, INC., MICHAEL THOMPSON and SHERYL THOMPSON (collectively referred to as "A-1 Metals" or "Defendants").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a) of the Act, 33 U.S.C. § 1365(a), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  Specifically, this action arises under Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A) (citizen suit to enforce effluent standard or limitation).  The relief requested is authorized pursuant to 33 U.S.C. §1365(a) (injunctive relief), 33 U.S.C. §§ 1365(a), 1319(d) (civil penalties), and 28 U.S.C. §§ 2201–2202 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration).

2.      On or about October 6, 2014, Plaintiffs provided written notice to Defendants, via certified mail, of Defendants' violations of the Act ("CWA Notice Letter"), and of their intention to file suit against Defendants, as required by the Act. *See* 33 U.S.C. § 1365(b)(1)(A); 40 C.F.R. § 135.2(a)(1) (1991).  Plaintiffs mailed a copy of the CWA Notice Letter to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

Executive Director of the State Water Resources Control Board ("State Board"); and the Executive Officer of the Regional Water Quality Control Board, Central Valley Region ("Regional Board"), pursuant to 40 C.F.R. § 135.2(a)(1) (1991).  Based on available information, there is no registered agent for Defendants.  A true and correct copy of CSPA and EDC's CWA Notice Letter is attached hereto as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since Plaintiffs served this CWA Notice Letter on Defendants.  Plaintiffs are informed and believe, and thereupon allege, that neither the EPA nor the State of California has commenced nor is diligently prosecuting a court action to redress the violations alleged in this Complaint.  This action's claims for civil penalties are not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the sources of the violations are located within this District.  Venue is also proper under 28 U.S.C. § 1391(b) because Defendants reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  Intra-district venue is proper in Los Angeles, California, because the sources of the violations are located within San Luis Obispo County.

## II.  INTRODUCTION

5.      This Complaint seeks relief for Defendants' violations of the CWA at the approximately five-acre auto dismantling and scrap metal processing facility owned and/or operated by Defendants (the "Facility").  The Facility is located at 5795 Stockdale Road, in Paso Robles, California.  Defendants discharge pollutant-contaminated storm water from the Facility into the Salinas River and ultimately into Monterey Bay.  Defendants are in violation of both the substantive and procedural requirements of the CWA.

6.      Defendants' discharge of pollutant-contaminated storm water from the

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

Facility is in violation of the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 (hereinafter "General Permit" or "Permit").  Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

7.     The failure on the part of industrial facility operators such as Defendants to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of receiving waters, such as the Salinas River and Monterey Bay.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to the Salinas River and Monterey Bay.

III.   **PARTIES**

8.     Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California.  CSPA has approximately 2,000 members who live, recreate and work in and around the waters of the State of California, including the Salinas River and Monterey Bay.  CSPA is dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California.  To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

9.     Plaintiff ENVIRONMENTAL DEFENSE CENTER is a non-profit

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

public benefit corporation dedicated to the protection and enhancement of the environment through education, advocacy, and legal action. EDC has approximately 3,000 members and works primarily within San Luis Obispo, Santa Barbara, and Ventura Counties. Storm water pollution, including pollution in waterways such as the Salinas River, directly impacts all three of EDC's main organizational missions: protection of coast and ocean resources, open spaces and wildlife, and human and environmental health.

10. Members of CSPA and EDC reside in California and use and enjoy California's numerous rivers for recreation and other activities. Members of CSPA and EDC use and enjoy the waters of the Salinas River and/or Monterey Bay, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged. Members of CSPA and EDC use these areas to fish, sail, boat, kayak, swim, bird watch, view wildlife, and engage in scientific study, including monitoring activities, among other things. Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CSPA's and EDC's members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act. The relief sought herein will redress the harms to Plaintiffs caused by Defendants' activities.

11. Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiffs and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

12. Plaintiffs are informed and believe, and thereupon allege that Defendants A-1 METALS AND AUTO SALVAGE, INC., MICHAEL THOMPSON and SHERYL THOMPSON own and/or operate the Facility.

## IV. LEGAL BACKGROUND

### A. Clean Water Act

13. Congress enacted the CWA to "restore and maintain the chemical,

physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The CWA establishes an "interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water . . . ." 33 U.S.C. § 1251(a)(2).  To these ends, Congress developed both a water quality-based and technology-based approach to regulating discharges of pollutants from point sources into waters of the United States.

14.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant from a point source into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

15.    The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

16.    A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

17.    "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  Waters of the United States includes, among others things, waters that are, were, or are susceptible to use in interstate commerce, and tributaries to such waters. 33 C.F.R § 328.3 (a) (1986).

18.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program, 33 U.S.C. §1342(p), and, specifically, requires an NPDES permit for storm water discharges associated with industrial activity.  *Id.* § 1342(p)(2)(B).

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

19.     Section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, 33 U.S.C. § 1362(5), for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §1365(a)(1) (authorizing actions against any person alleged to be in violation of an effluent standard or limitation); *id.* §1365(f) (defining "effluent limitation" broadly to include "a permit or condition thereof issued under [section 402] of this title," and "any unlawful act under subsection (a) of [section 301] of this title").

20.     An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. §§ 19.1–19.4 (2008).

**B.     California Industrial Storm Water General Permit**

21.     Section 402 authorizes states with approved NPDES permit programs to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(b).

22.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

23.     The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

24.     Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

must apply for coverage under the State's General Permit by filing a Notice of Intent ("NOI").  The General Permit requires existing facilities to file their NOIs before March 30, 1992.

25.     Once regulated by a NPDES permit, facilities must strictly comply with all of the terms and conditions of the Permit.  A violation of the General Permit is a violation of the Act. *See* General Permit, Section C(1) (Standard Provisions).

26.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

27.     The General Permit contains three primary and interrelated categories of requirements: 1) discharge prohibitions; 2) Storm Water Pollution Prevention Plan ("SWPPP") requirements; and 3) monitoring and reporting requirements, including the requirement to prepare an annual report.

28.     Discharge Prohibition A(1) of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit prohibits storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, or the Criteria for Priority Toxic Pollutants for the State of California ("CTR"), 40 C.F.R. § 131.38 (2013).

29.     Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).

30.     EPA has established Benchmark Levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT standards.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been established for pollutants discharged by Defendants: Total Suspended Solids – 100 mg/L; Oil and Grease – 15 mg/L; Chemical Oxygen Demand – 120 mg/L; Iron - 1 mg/L; Aluminum - 0.75 mg/L; Copper, Lead, Zinc - water hardness dependent levels.  The State Board has proposed adding a benchmark level for Specific Conductance of 200 µmhos/cm.

31.     The Regional Board has established water quality standards for the Salinas River and Monterey Bay in the Water Quality Control Plan for the Central Coast Basin, generally referred to as the "Basin Plan."

32.     The Basin Plan includes a toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to or which produce detrimental physiological responses in, human, plant, animal, or aquatic life."

33.     The Basin Plan provides that "[w]aters shall not contain concentrations of chemical constituents known to be deleterious to fish or wildlife."

34.     The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."

35.     EPA issued the CTR in 2000, establishing numeric receiving water limits for certain toxic pollutants in California surface waters.  40 C.F.R. § 131.38 (2013).  The CTR establishes the following numeric limits for freshwater surface waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); and lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration), subject to water hardness.

36.     Dischargers must develop and implement a SWPPP before October 1, 1992.  General Permit, Section A(1), Provision E(2).  The purpose of the SWPPP is to identify sources of pollutants in storm water discharges, implement BMPs to reduce exposure to these sources, and reduce or prevent the pollutants in storm water runoff. General Permit, Section A(2).  The SWPPP must comply with the BAT and BCT standards. General Permit, Section B(3).  The SWPPP must include, among other elements:  (1) a narrative description and summary of all industrial activity, potential sources of pollutants and potential pollutants; (2) a site map showing facility boundaries, the storm water conveyance system, associated points of discharge, direction of flow, areas of industrial activities, and areas of actual and potential pollutant contact; (3) a description of storm water management practices, best management practices ("BMPs") and preventive maintenance undertaken to avoid storm water contamination that achieve BAT and BCT; (4) the location where Significant Materials are being shipped, stored, received and handled, as well as the typical quantities of such materials and the frequency with which they are handled; (5) a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities; (6) a summary of storm water sampling points; (7) a description of individuals and their responsibilities for developing and implementing the SWPPP; (8) a description of potential pollutant sources including industrial processes, material handling and storage areas, and dust and particulate generating activities; (9) a description of significant spills and leaks; (10) a list of all non-storm water discharges and their sources; and (11) a description of locations where soil erosion may occur.  The

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

SWPPP must also include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective. General Permit Sections A(1) through A(9).

37.     Dischargers must reevaluate their SWPPP annually to ensure effectiveness and must revise it where necessary. General Permit, Section A(9),(10). Section C(3) of the General Permit requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60 days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Section C(4)(a).  Section C(11)(d) of the General Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Section E(6).  Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

38.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the General Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

39.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written Monitoring and Reporting Program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

11

monitoring programs no later than August 1, 1997.

40.     The General Permit also requires dischargers to submit yearly "Annual Reports" to the Regional Board.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must then conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS"), specific conductance ("SC"), and total organic carbon ("TOC") or oil and grease ("O&G"), certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.  The monitoring and reporting program requires dischargers to certify, based upon the annual site inspections, that the facility is in compliance with the General Permit and report any non-compliance, and contains additional requirements as well.

## V.     STATEMENT OF FACTS

### A.     A-1 Metals' Operations

41.     A-1 Metals submitted a Notice of Intent ("NOI") to discharge under the Storm Water Permit in 1988 and subsequently submitted an additional NOI in 2006.

42.     The Facility certified in its NOI that it is classified as conforming to Standard Industrial Classification ("SIC") Codes 5093 ("Processing, Reclaiming, and Wholesale Distribution of Scrap and Waste Materials") and 5015 ("Motor Vehicle Parts, Used").  Industrial activities occur throughout the Facility.

43.     The Facility is used to receive, store, handle, dismantle and recycle

decommissioned vehicles, equipment and automotive parts.  Most of these activities occur outside in areas that are exposed to storm water and storm flows due to the lack of overhead coverage, functional berms and other storm water controls.  Plaintiffs are informed and believe that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

44.     Plaintiffs are informed and believe that pollutants associated with A-1 Metals' operations include: heavy metals (aluminum, copper, iron, lead, and zinc); trash; SC; COD; TSS; dust and other dirt; oil and grease; antifreeze; brake fluid; transmission and lubrication fluids; cleaners and solvents; recyclable materials; hazardous wastes, and other pollutants.

45.     A-1 Metals certified in its NOI that it discharges storm water into the Salinas River.

46.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT standards. The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants, thereby allowing storm water to flow over and across these materials and become contaminated prior to leaving the Facility.  In addition, the Facility lacks structural controls to prevent the discharge of water once contaminated. The Facility also lacks an adequate filtration system to treat water once it is contaminated.

47.     Vehicle traffic at the Facility tracks dust and particulate matter, increasing the discharges of polluted water into waters of the United States.

48.     During rain events, storm water laden with pollutants discharges from the Facility to the Salinas River and ultimately into Monterey Bay.

49.     Information available to Plaintiffs indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

human health are being discharged from the Facility to these waters during significant rain events.

**B.**    **A-1 Metals' Contaminated Storm Water Discharges**

50.    Information available to Plaintiffs indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Since enrolling under the General Permit, Defendants have taken samples or arranged for samples to be taken of storm water discharges at the Facility.  According to annual reports filed with the Regional Board, A-1 Metals conducts sampling from two locations.

51.    In annual reports submitted to the Regional Board for 2009-2010, 2010-2011, 2011-2012, 2012-2013, and 2013-2014, A-1 Metals has consistently reported extremely high pollutant levels from its sampling results, including high measurements of Copper, Lead, Iron, Zinc, Aluminum, TSS, SC and COD.  For example, Copper levels reaching as high as thirty-five times benchmark levels have been recorded.

52.    Specific measures of discharges containing concentrations of pollutants in excess of EPA benchmarks and receiving water limitations are presented in table form in Plaintiffs' October 6, 2014 Notice of Intent to Sue, included as Exhibit A to this Complaint.

53.    The levels of copper in storm water detected at the A-1 Metals Facility have exceeded the benchmark value for copper established by EPA.

54.    The levels of copper in storm water detected at the A-1 Metals Facility have also exceeded the CTR Criteria for copper.

55.    A-1 Metals reported concentrations of copper in its discharges at levels of 0.39 mg/L, 0.1 mg/L, 0.23 mg/L, 0.098 mg/L and 0.44 mg/L.  Each of these sampling results demonstrates an exceedance of both the EPA benchmark and the CTR criteria for copper, which are 0.0123 mg/L, and 0.011 mg/L, respectively. The discharge of copper in high concentrations is ongoing and continuous.

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

56.     The levels of lead in storm water detected at the A-1 Metals Facility have exceeded the benchmark value for lead established by EPA.

57.     The levels of lead in storm water detected at the A-1 Metals Facility have also exceeded the CTR Criteria for lead.

58.     A-1 Metals reported concentrations of lead in its discharges at levels of 0.088 mg/L, 0.38 mg/L, 0.2 mg/L, 0.32 mg/L and 0.12 mg/L.  Each of these sampling results demonstrates both an exceedance of the EPA benchmark and CTR criteria for lead, which are 0.069 mg/L, and 0.061 mg/L, respectively.  The discharge of lead in high concentrations is ongoing and continuous.

59.     The levels of TSS in storm water detected at the A-1 Metals Facility have exceeded the benchmark value for TSS established by EPA.

60.     A-1 Metals reported concentrations of TSS in its discharges at levels of 450 mg/L, 480 mg/L, 1167 mg/L, 253 mg/L, 326 mg/L, 354 mg/L, 380 mg/L, and 285 mg/L.  Each of these sampling results demonstrates an exceedance of the EPA benchmark for TSS, which is 100 mg/L. The discharge of TSS in high concentrations is ongoing and continuous.

61.     The levels of SC in storm water detected at the A-1 Metals Facility have exceeded the benchmark value for SC established by EPA.

62.     A-1 Metals reported concentrations of SC in its discharges at levels of 245 mg/L, 301 mg/L, and 201 mg/L. Each of these sampling results demonstrates an exceedance of the EPA benchmark for SC, which is 200 mg/L. The discharge of SC in high concentrations is ongoing and continuous.

63.     The levels of COD in storm water detected at the A-1 Metals Facility have exceeded the benchmark value for COD established by EPA.

64.     A-1 Metals reported concentrations of COD in its discharges at levels of 203 mg/L, 121 mg/L, 232 mg/L, and 159 mg/L. Each of these sampling results demonstrates an exceedance of the EPA benchmark for COD, which is 120 mg/L. The discharge of SC in high concentrations is ongoing and continuous.

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

65.     The levels of iron in storm water detected at the A-1 Metals Facility have exceeded the benchmark value for iron established by EPA.

66.     A-1 Metals reported concentrations of iron in its discharges at levels of 2.9 mg/L, 3.9 mg/L, 1.5 mg/L, 19.4 mg/L, 15.2 mg/L, 22.0 mg/L, 12.0 mg/L, 27.1 mg/L, and 4.5 mg/L.  Each of these sampling results demonstrates an exceedance of the EPA benchmark for iron, which is 1.0 mg/L. The discharge of iron in high concentrations is ongoing and continuous.

67.     The levels of aluminum in storm water detected at the A-1 Metals Facility have exceeded the benchmark value for aluminum established by EPA.

68.     A-1 Metals reported concentrations of aluminum in its discharges at levels of 2.9 mg/L, 3.5 mg/L, 1.4 mg/L, 0.88 mg/L, 15.5 mg/L, 15.2 mg/L, 12.0 mg/L, 8.9 mg/L, 19.5 mg/L and 5.23 mg/L. Each of these sampling results demonstrates an exceedance of the EPA benchmark for aluminum, which is 0.75 mg/L. The discharge of aluminum in high concentrations is ongoing and continuous.

69.     Despite Defendants' consistent detection of extremely high pollutant levels, A-1 Metals has not taken corrective action to achieve BAT/BCT at the Facility.

**C.     A-1 Metals' SWPPP and Monitoring and Reporting Failures**

70.     Plaintiffs are informed and believe, and thereupon allege, that Defendants have failed to develop and implement an adequate SWPPP at the Facility.

71.     Information available to Plaintiffs indicates the continued existence of unlawful storm water discharges at the Facility.

72.     Plaintiffs are informed and believe, and thereupon allege, that Defendants have failed to develop and implement adequate storm water monitoring, reporting and sampling programs at the Facility.  Plaintiffs are informed and believe, and thereupon allege, that Defendants have not sampled with adequate frequency, have not conducted visual monitoring, and have not analyzed the storm water samples collected at the Facility for the required pollutant parameters.

73.     Plaintiffs are informed and believe that A-1 Metals has failed to collect

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

storm water samples during at least two qualifying storms events, as defined by the General Permit[1], during all five of the past five Wet Seasons.  For example, A-1 Metals reported in its 2010-2011 Annual report that it only sampled from one qualifying storm event, even though there were numerous opportunities to sample such an event.  Further, in that same Annual Report, the storm event that A-1 Metals did sample was not a qualifying storm event.  Based on their review of publicly available rainfall data, CSPA and EDC are informed and believe that the storm that occurred at the Facility on February 18, 2011, was not a qualifying storm event because it rained 0.53" at the Facility on the day before.  Thus, the February 17, 2011, storm event rendered any storm occurring for three days afterwards non-qualifying.

74.     In four of the past five Wet Seasons, A-1 Metals reported that the Facility sampled the first qualifying storm event of the season, when in fact it did not sample the first storm of the season during those four Wet Seasons.  For example, A-1 Metals reported in its 2009-2010 Annual Report that it sampled the first qualifying storm event of the Wet Season on December 7, 2009.  Based upon its review of publicly available rainfall data, CSPA and EDC are informed and believe that the first qualifying storm event of the 2009-2010 Wet Season occurred as early as Wednesday, October 14, 2009, when 0.32" of rain fell on the Facility.

75.     Further, based on its investigation, Plaintiffs are informed and believe that storm water is discharged from the Facility at points other than the two sampling points currently designated by A-1 Metals.

76.     Plaintiffs are informed and believe that A-1 Metals has failed to conduct the monthly visual monitoring of storm water discharges and the quarterly visual observations of unauthorized non-storm water discharges required under the

---

[1] A "Qualifying Storm Event" under the General Permit is one in which (i) no storm water discharge has occurred from the Facility during the previous three (3) working days; (ii) there is sufficient rain to generate a discharge flow that can be physically sampled; and (iii) the discharge to be sampled occurs during normal operating hours.

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

General Permit during the past two Wet Seasons.  Specifically, A-1 Metals failed to conduct monthly visual observations of discharges from qualifying storm events for all months during five of the past five Wet Seasons as required by the General Permit. Instead, A-1 Metals either completely failed to document visual observations at all, or documented its visual observations of storm water that discharged during non-qualifying storm events during five of the past five Wet Seasons.  However, based on publicly available rainfall data, CSPA and EDC are informed and believe that there were many qualifying storm events during each of these Wet Seasons that A-1 Metals could have observed.  For example, A-1 Metals reported in its 2013-2014 Annual Report that it did not observe a discharge or there was no rain during the entire Wet Season, despite rain data demonstrating numerous significant rainfall events during those months.

77.     A1 Metals has also failed to employ adequate testing methods in violation of the General Permit. In four of the past five years, the test methods and detection limits employed by the laboratory utilized by A-1 Metals to analyze the concentration of the pollutants present in the storm water discharged from its Facility did not comply with the Regional Board requirements.  For example, the testing method A-1 Metals was required to apply for lead, aluminum, and iron was EPA 200.8 with a detection limit of 0.0005.  However, in the annual report filed by A-1 Metals in 2009-2010 the laboratory utilized test method EPA 6020 with detection limits of 0.001, 1, and 0.0025 respectively.  Further, in the annual report filed by A-1 Metals in 2012-2013, the detection limits for aluminum and iron were above the required detection limits.

78.     Significantly, A-1 Metals has failed to analyze storm water samples for all required constituents. As a facility enrolled under SIC Code 5093, A-1 Metals must also analyze samples for Zinc. *See* Storm Water Permit, Section B(5)(c)(iii)*; id.* at Table D, Section N.  It has failed to do so on every occasion that it sampled since October 6, 2009.

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

79.     Finally, based on their review of publicly available documents, Plaintiffs are informed and believe that for two of the past five Wet Seasons, A-1 Metals has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility, including aluminum 0.75 mg/L ; oil & grease – 15 mg/L; mercury – 0.0024 mg/L; nickel – 1.417 mg/L; magnesium – 0.0636 mg/L and cadmium – 0.0159 mg/L.

80.     Plaintiffs' investigations indicate that A-1 Metals has submitted incomplete Annual Reports and purported to comply with the General Permit despite significant noncompliance at the Facility.  For example, A-1 Metals reported in four Annual Reports filed for the past four Wet Seasons (i.e., 2009-2010, 2010-2011, 2011-2012, and 2012-2013) that it observed storm water discharges occurring during the first storm of those Wet Seasons.  However, as discussed above, based on their review of publicly available rainfall data, CSPA and EDC believe this is incorrect.

81.     Plaintiffs are informed and believe, and thereupon allege, that all of the violations alleged in this Complaint are ongoing and continuous.

## V.     CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Discharges of Contaminated Storm Water From The Facility
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311(a), 1342)**

82.     Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

83.     Discharge Prohibition A(2) of the General Permit requires that storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the General Permit require that storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan,

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

or the CTR.

84.     Plaintiffs are informed and believe, and thereupon allege, that since at least October 1, 1992, Defendants have been discharging polluted storm water from the Facility into the Salinas River and Monterey Bay in violation of the General Permit.

85.     During every significant rain event, storm water flowing over and through materials at the Facility becomes contaminated with pollutants, flowing untreated from the Facility to the Salinas River and Monterey Bay.

86.     Plaintiffs are informed and believe, and thereupon allege, that these discharges of contaminated storm water are causing pollution and contamination of waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

87.     Plaintiffs are informed and believe, and thereupon allege, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitations C(1) and C(2) of the General Permit.

88.     Plaintiffs are informed and believe, and thereupon allege, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan, the applicable Regional Board's Basin Plan, and/or the CTR, in violation of Receiving Water Limitation C(2) of the General Permit.

89.     Plaintiffs are informed and believe, and thereupon allege, that every day since March 30, 1992, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit. These violations are ongoing and continuous.

90.     Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since October 6, 2009.

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

See 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

**SECOND CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Storm Water Pollution Prevention Plan For the Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

91.     Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

92.     Section A and Provision E of the General Permit require dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

93.     Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials without appropriate best management practices; the continued exposure of significant quantities of industrial material to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

94.     Defendants have further failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring as required by the General Permit.  Defendants have been in violation of the SWPPP requirement every day since October 1, 1992.  Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.  These violations are ongoing and continuous.

95.     Each day since October 1, 1992 that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Defendants are subject to civil penalties for each and every violation of the Act since October 6, 2009. *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

**THIRD CLAIM FOR RELIEF**
**Failure to Develop and Implement the Best Available**
**And Best Conventional Treatment Technologies at The Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

96.     Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

97.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

98.     Defendants have failed to implement BAT and BCT at the Facility for their discharges of Total Suspended Solids, Oil and Grease, Chemical Oxygen Demand, Iron, Aluminum, Copper, Lead, Zinc, Specific Conductance, and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

99.     Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

100.     Defendants continue to be in violation of the BAT and BCT requirements each day that it fails to develop and fully implement BMPs meeting the BAT and BCT standards. These violations are ongoing and continuous.

101.     Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least October 6, 2009.  Defendants are subject to civil penalties for each and every violation of the Act since October 6, 2009. *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

**FOURTH CLAIM FOR RELIEF**
**Failure to Develop and Implement an Adequate**
**Monitoring and Reporting Program for The Facility**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

102.     Plaintiffs incorporate the allegations contained in the above paragraphs as though fully set forth herein.

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

103.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement a monitoring and reporting program (including, among other things, sampling and analysis of discharges) no later than October 1, 1992.

104.     Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility.  Defendants' ongoing failures to develop and implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their continuing failure to collect and analyze storm water samples from all discharge locations, their continuing failure to analyze storm water samples for pollutants likely to be present in the Facility's storm water discharges in significant quantities and other pollutants, including zinc, as the General Permit requires, their failure and their failure to file required Annual Reports with the Regional Board which provide required documentation and information relating to visual observations and storm water sampling and analysis conducted at the Facility.

105.     Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility in each day since October 1, 1992. These violations are ongoing and continuous.

106.     Each day of violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. §1311(a).  Defendants are subject to civil penalties for each and every violation of the Act since October 6, 2009. *See* 33 U.S.C. §§1319 (d), 1365; 40 C.F.R. §19.4 (2008).

## VI.   RELIEF REQUESTED

Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

a.   Declare Defendants to have violated and to be in violation of the Act and General Permit, as alleged herein;

b.   Enjoin Defendants from discharging pollutants from the Facility and

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

23

1  to the surface waters surrounding and downstream from the Facility in violation of

2  the Act and the General Permit;

3         c.  Enjoin Defendants from further violating the substantive and

4  procedural requirements of the General Permit;

5         d.  Order Defendants to pay civil penalties of $37,500 per day per

6  violation for all violations occurring after January 12, 2009, pursuant to Sections

7  309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§

8  19.1–19.4 (2008);

9         e.  Order Defendants to take appropriate actions to restore the quality of

10 navigable waters impaired by their activities;

11        f.  Award Plaintiffs' costs and fees (including reasonable attorney,

12 witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

13        g.  Award any such other and further relief as this Court may deem

14 appropriate.

15 Dated: December 9, 2014        Respectfully Submitted,

16                           LAW OFFICES OF ANDREW L. PACKARD

17                           By:  _/s/ Andrew L. Packard

18                           Andrew L. Packard

19                           Attorney for Plaintiff
CALIFORNIA SPORTFISHING

20                           PROTECTION ALLIANCE

21                           ENVIRONMENTAL DEFENSE CENTER

22                           By:  _/s/ Margaret Morgan Hall

23                           Margaret Morgan Hall

24                           Attorney for Plaintiff
ENVIRONMENTAL DEFENSE CENTER

25

26

27

28

*Complaint For Declaratory and Injunctive Relief and Civil Penalties*

**EXHIBIT A**

 

October 6, 2014

VIA CERTIFIED MAIL
<u>RETURN RECEIPT REQUESTED</u>

Michael W. Thompson
A-1 Metals & Auto Salvage
5795 Stockdale Rd
Paso Robles, CA 93446

Sheryl Thompson
A-1 Metals & Auto Salvage
5795 Stockdale Rd
Paso Robles, CA 93446

A-1 Metals & Auto Salvage
5795 Stockdale Rd
Paso Robles, CA 93446

A-1 Metals and Auto Salvage Inc.
5795 Stockdale Rd
Paso Robles, CA 93446

Lyle E. Stevens, Registered Agent
A-1 Metals and Auto Salvage Inc.
1105 Vine Street
Paso Robles, CA 93446

**Re:    Notice of Violations and Intent to File Suit Under the Federal Water**
**Pollution Control Act**

To Whom It May Concern:

We are writing on behalf of the California Sportfishing Protection Alliance
("CSPA") and the Environmental Defense Center ("EDC") in regard to violations of the
Clean Water Act ("the Act") occurring at A-1 Metals & Auto Salvage's ("A-1 Metals")
facility located at 5795 Stockdale Road, in Paso Robles, California, 93446 ("the
Facility"). The WDID number for the Facility is 3 40I010951. CSPA is a non-profit
public benefit corporation dedicated to the preservation, protection and defense of the

Notice of Violation and Intent To File Suit
October 6, 2014
Page 2 of 20

environment, wildlife and natural resources of California waters, including the Salinas River, and the Monterey Bay.  EDC is a non-profit public benefit corporation dedicated to the protection and enhancement of the environment through education, advocacy, and legal action.  EDC works primarily within San Luis Obispo, Santa Barbara, and Ventura Counties.  This letter is being sent to you as the responsible owners, officers, or operators of the Facility.  Unless otherwise noted, Michael Thompson, Sheryl Thompson, A-1 Metals & Auto Salvage, and A-1 Metals & Auto Salvage, Inc. shall hereinafter be collectively referred to as "A-1 Metals."

This letter addresses A-1 Metals' unlawful discharges of pollutants from the Facility to the Salinas River, which ultimately flows into Monterey Bay.  A-1 Metals is in ongoing violation of the substantive and procedural requirements of the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of its intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency, and the State in which the violations occur. *See* 40 C.F.R. § 135.2.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility.  Consequently, Michael Thompson, Sheryl Thompson, A-1 Metals & Auto Salvage, and A-1 Metals & Auto Salvage, Inc. are hereby placed on formal notice by CSPA and EDC that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA and EDC intend to file suit in federal court against Michael Thompson, Sheryl Thompson, A-1 Metals & Auto Salvage, and A-1 Metals & Auto Salvage, Inc. under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit.  These violations are described more fully below.

## I.      Background.

### A. The Clean Water Act.

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges.  *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutant by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements.  33 U.S.C. § 1311(a).  The permit requirement

extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological materials, heat, rock, and sand discharged into water. 33 U.S.C. § 1362(6). A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). "Navigable waters" means "the waters of the United States" and includes, for example, traditionally navigable waters and tributaries to such waters. U.S.C. § 1362(7); 33 C.F.R. § 328.333 (a)(1)-(7). Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States. *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

CSPA and EDC are informed and believe, and thereupon allege, that A-1 Metals has discharged, and continues to discharge, pollutants from the Facility to waters of the United States, through point sources, in violation of the terms of the General Permit, every day that there has been or will be any measurable discharge of storm water from the Facility since at least March 7, 1994. Each discharge, on each separate day, is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These unlawful discharges are ongoing. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, A-1 Metals is subject to penalties for violations of the Act since October 6, 2009.

## B. A-1 Metals Facility, Water Quality Standards, and EPA Benchmarks

The Facility is located at 5795 Stockdale Road in the city of Paso Robles and discharges to the Salinas River. The Facility falls under Standard Industrial Classification ("SIC") Codes 5015 ("Motor Vehicle Parts, Used") and 5093 ("Processing, Reclaiming, and Wholesale Distribution of Scrap and Waste Materials"). Accordingly A-1 Metals must analyze storm water samples for total suspended solids ("TSS"), pH, Specific Conductance ("SC"), and total organic carbon ("TOC") or oil and grease ("O&G"), *see* Storm Water Permit, Section B(5)(c)(i), in addition to iron, lead, aluminum, copper, zinc and chemical oxygen demand ("COD"). *See* Storm Water Permit, Section B(5)(c)(iii); *id.* at Table D, Sections M and N.

A-1 Metals submitted a Notice of Intent ("NOI") to discharge under the Storm Water Permit in 2006 and subsequently submitted an additional NOI in 2011. CSPA's and EDC's investigations into the industrial activities at A-1 Metals' approximately five-acre Facility indicate that the Facility is used to receive, store, handle, dismantle and recycle decommissioned vehicles, equipment and automotive parts. A-1 Metals collects and discharges storm water from the Facility through at least two (2) discharge points

Notice of Violation and Intent To File Suit
October 6, 2014
Page 4 of 20

into the Salinas River, which ultimately flows into Monterey Bay.  The Salinas River and
Monterey Bay are waters of the United States within the meaning of the Clean Water Act.

The Central Coast Regional Water Quality Control Board ("Regional Board") has
established water quality standards for the Salinas River and Monterey Bay in the "Water
Quality Control Plan for the Central Coast Basin" ("Basin Plan").  The Basin Plan
incorporates in its entirety the State Board's "Water Quality Control Plan for Ocean
Waters of California" ("Ocean Plan").  The Ocean Plan "sets forth limits or levels of
water quality characteristics for ocean waters to ensure the reasonable protection of
beneficial uses and the prevention of nuisance.  The discharge of waste shall not cause
violation of these objectives."  *Id*. at 4.  The Ocean Plan limits the concentration of
organic materials in marine sediment to levels that would not degrade marine life.  *Id*. at
6.  The Basin Plan establishes ocean water quality objectives, including that dissolved
oxygen is not to be less than 7.0 mg/l and pH must be between 7.0 - 8.5 s.u.  *Id*. at III-2.
It also establishes that toxic metal concentrations in marine habitats shall not exceed:  Cu
– 0.01 mg/L; Pb – 0.01 mg/L; Hg – 0.0001 mg/L; Ni – 0.002 mg/L; and, Zn – 0.02 mg/L.
*Id.* at III-12.

The Basin Plan provides maximum contaminant levels ("MCLs") for organic
concentrations and inorganic and fluoride concentrations, not to be exceeded in domestic
or municipal supply.  *Id*. at III-6 - III-7.  It requires that water designated for use as
domestic or municipal supply shall not exceed the following maximum contaminant
levels: aluminum – 1.0 mg/L; arsenic - 0.05 mg/L; lead - 0.05 mg/L; and mercury - 0.002
mg/L.  *Id*. at III-7.  The EPA has also issued recommended water quality criterion MCLs,
or Treatment Techniques, for mercury - 0.002 mg/L; lead – 0.015 mg/L; chromium – 0.1
mg/L; and, copper – 1.3 mg/L.

The EPA has also issued a recommended water quality criterion for aluminum for
freshwater aquatic life protection of 0.087 mg/L.  In addition, the EPA has established a
secondary MCL, consumer acceptance limit for aluminum - 0.05 mg/L to 0.2 mg/L, and
for zinc - 5.0 mg/L.  *See* http://www.epa.gov/safewater/ mcl.html.  Finally, the California
Department of Health Services has established the following MCL, consumer acceptance
levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L
(primary); copper – 1.0 mg/L (secondary); iron – 0.3 mg/L; and zinc – 5.0 mg/L.  *See*
California Code of Regulations, title 22, §§ 64431, 64449.

The California Toxics Rule ("CTR"), issued by the EPA in 2000, establishes
numeric receiving water limits for certain toxic pollutants in California surface waters.
40 C.F.R. § 131**.**38**.**  The CTR establishes the following numeric limits for freshwater
surface waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L
(continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and
0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration)
and 0.009 mg/L (continuous concentration); and lead – 0.065 mg/L (maximum
concentration) and 0.0025 mg/L (continuous concentration), subject to water hardness.

The Regional Board has identified waters of the Central Coast as failing to meet water quality standards for pollutant/stressors such as unknown toxicity, numerous pesticides, and mercury.[1]  Discharges of pollutants into a surface water body may be deemed a "contribution" to an exceedance of the CTR, an applicable water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the General Industrial Storm Water Permit was "subject to effluent limitations as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

The General Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").  The following benchmarks have been established for pollutants discharged by A-1 Metals: Total Suspended Solids – 100 mg/L; Chemical Oxygen Demand – 120 mg/L; Iron – 1.0 mg/L; Aluminum – 0.75 mg/L; Copper, Lead and Zinc– water-hardness dependent levels.  The State Water Quality Control Board has also proposed adding a benchmark level for specific conductance of 200 µmhos/cm and total organic carbon – 110 mg/L.  Additional EPA benchmark levels have been established for other parameters that CSPA and EDC believes are being discharged from the Facility, including but not limited to: pH – 6.0 – 9.0 s.u. oil & grease – 15.0 mg/L.

## II.     A-1 Metals' Violations of the General Permit.

Based on its review of available public documents, CSPA and EDC are informed and believe that A-1 Metals is in ongoing violation of both the substantive and procedural requirements of the Clean Water Act, as discussed in detail below.

### A.   A-1 Metals Has Discharged Storm Water Containing Pollutants in Violation of Effluent Limitation B(3), Discharge Prohibition A(2), and Receiving Water Limitations C(1) and C(2).

The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, Oil & Grease ("O&G"), pH, biochemical oxygen demand ("BOD"),

---

[1] *See* http://www.waterboards.ca.gov/water_issues/programs/tmdl/2010state_ir_reports/category5_report.shtml.

Notice of Violation and Intent To File Suit
October 6, 2014
Page 6 of 20

and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the General Permit provides:  "Except as allowed in Special Conditions (D.1.) of this General Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the General Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.  Discharge Prohibition A(2) provides: "Storm water discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution, contamination, or nuisance."

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

A-1 Metals has discharged and continues to discharge storm water with unacceptable levels of Total Suspended Solids, Specific Conductance, Chemical Oxygen Demand, Iron, Aluminum, Copper, and Lead in violation of the General Permit.  These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A.  A-1 Metals' Annual Reports and Sampling and Analysis Results confirm discharges of specific pollutants in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Effluent Limitation B(3), Discharge Prohibition A(2) and/or Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

1. **Discharges of Storm Water Containing Copper (Cu) at Concentrations in Excess of EPA Benchmark and CTR Criteria.**

Notice of Violation and Intent To File Suit
October 6, 2014
Page 7 of 20

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value[2] | CTR Criteria[3] |
|------|-----------------|-----------|----------------------------|---------------------|-----------------|
| 1/23/12 | North Discharge | Cu | 0.39 mg/L | 0.0123 mg/L | 0.011 mg/L |
| 1/23/12 | South Discharge | Cu | 0.1 mg/L | 0.0123 mg/L | 0.011 mg/L |
| 4/12/12 | North Discharge | Cu | 0.23 mg/L | 0.0123 mg/L | 0.011 mg/L |
| 4/12/12 | South Discharge | Cu | 0.098 mg/L | 0.0123 mg/L | 0.011 mg/L |
| 2/6/13 | North Discharge | Cu | 0.44 mg/L | 0.0123 mg/L | 0.011 mg/L |

**2. Discharges of Storm Water Containing Lead (Pb) at Concentrations in Excess of EPA Benchmark and CTR Criteria.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value | CTR Criteria |
|------|-----------------|-----------|----------------------------|------------------|--------------|
| 12/07/09 | North Discharge | Pb | 0.088 mg/L | 0.069 mg/L | 0.061 mg/L |
| 1/18/10 | North Discharge | Pb | 0.38 mg/L | 0.069 mg/L | 0.061 mg/L |
| 1/18/10 | South Discharge | Pb | 0.2 mg/L | 0.069 mg/L | 0.061 mg/L |

---

[2] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP)*, as modified effective May 27, 2009.  Copper and lead are both hardness-dependent benchmarks, and a hardness of 75-100mg/L was used for this Notice Letter for the Copper values expressed in this table and the table concerning Lead below.  Even with a hardness of 250+, A1 Metals would still exceed EPA benchmarks by magnitudes.

[3] Criteria for priority toxic pollutants under the CTR are set forth at 40 C.F.R. § 131.38.  The regulation lists the criteria in the form of dissolved metals, whereas the General Permit requires reporting in the form of total metals. General Permit at Section B(10)(b).  The CTR criteria listed in this Notice Letter are therefore expressed in total metals to provide an accurate basis of comparison for both the Copper values expressed in this table and the table concerning Lead below. *See* 40 C.F.R. § 131.38(b)(2)(i) (conversion formula). This Notice Letter assumes a hardness of 75-100mg/L, however, even with a greater hardness, A1 Metals would still exceed the relevant CTR criteria.

Notice of Violation and Intent To File Suit
October 6, 2014
Page 8 of 20

| 4/12/12 | North Discharge | Pb | 0.32 mg/L | 0.069 mg/L | 0.061 mg/L |
|---------|-----------------|-----|-----------|------------|------------|
| 4/12/12 | South Discharge | Pb | 0.12 mg/L | 0.069 mg/L | 0.061 mg/L |

**3. Discharges of Storm Water Containing Total Suspended Solids (TSS) at Concentration in Excess of Applicable EPA Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|-----------------|-----------|----------------------------|---------------------|
| 1/18/10 | North Discharge | TSS | 450 mg/L | 100 mg/l |
| 1/18/10 | South Discharge | TSS | 480 mg/L | 100 mg/l |
| 2/18/11 | North Discharge | TSS | 1167 mg/L | 100 mg/L |
| 2/18/11 | South Discharge | TSS | 253 mg/L | 100 mg/L |
| 1/23/12 | North Discharge | TSS | 326 mg/L | 100 mg/L |
| 1/23/12 | South Discharge | TSS | 354 mg/L | 100 mg/L |
| 4/12/12 | North Discharge | TSS | 380 mg/L | 100 mg/L |
| 4/12/12 | South Discharge | TSS | 285 mg/L | 100 mg/L |

**4. Discharges of Storm Water Containing Specific Conductance (SC) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 2/18/11 | South | SC | 245 mg/L | 200 mg/l |

Notice of Violation and Intent To File Suit
October 6, 2014
Page 9 of 20

| 4/12/12 | South | SC | 301 mg/L | 200 mg/L |
| 2/6/13 | South | SC | 201 mg/L | 200 mg/L |

**5. Discharge of Storm Water Containing Chemical Oxygen Demand (COD) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 1/23/12 | North Discharge | COD | 203 mg/L | 120 mg/l |
| 1/23/12 | South Discharge | COD | 121 mg/L | 120 mg/L |
| 4/12/12 | North Discharge | COD | 232 mg/L | 120 mg/L |
| 4/12/12 | South Discharge | COD | 159 mg/L | 120 mg/L |

**6. Discharge of Storm Water Containing Iron (Fe) at Concentration in Excess of EPA Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 12/7/09 | North Discharge | Fe | 2.9 mg/L | 1.0 mg/L |
| 12/7/09 | South Discharge | Fe | 3.9 mg/L | 1.0 mg/L |
| 1/18/010 | North Discharge | Fe | 1.5 mg/L | 1.0 mg/L |
| 1/23/12 | North Discharge | Fe | 19.4 mg/L | 1.0 mg/L |
| 1/23/12 | South Discharge | Fe | 15.2 mg/L | 1.0 mg/L |
| 4/12/12 | North Discharge | Fe | 22.0 mg/L | 1.0 mg/L |
| 4/12/12 | South Discharge | Fe | 12.0 mg/L | 1.0 mg/L |

Notice of Violation and Intent To File Suit
October 6, 2014
Page 10 of 20

| 2/6/13 | North Discharge | Fe | 27.1 mg/L | 1.0 mg/L |
| 2/6/13 | South Discharge | Fe | 4.5 mg/L | 1.0 mg/L |

**7. Discharge of Storm Water Containing Aluminum (Al) at Concentration in Excess of EPA Proposed Benchmark.**

| Date | Discharge Point | Parameter | Concentration in Discharge | EPA Benchmark Value |
|---|---|---|---|---|
| 12/7/09 | North Discharge | Al | 2.9 mg/L | 0.75 mg/L |
| 12/7/09 | South Discharge | Al | 3.5 mg/L | 0.75 mg/L |
| 1/18/10 | North Discharge | Al | 1.4 mg/L | 0.75 mg/L |
| 1/18/10 | South Discharge | Al | 0.88 mg/L | 0.75 mg/L |
| 1/23/12 | North Discharge | Al | 15.5 mg/L | 0.75 mg/L |
| 1/23/12 | South Discharge | Al | 15.2 mg/L | 0.75 mg/L |
| 4/12/12 | North Discharge | Al | 12.0 mg/L | 0.75 mg/L |
| 4/12/12 | South Discharge | Al | 8.9 mg/L | 0.75 mg/L |
| 2/6/13 | North Discharge | Al | 19.5 mg/L | 0.75 mg/L |
| 2/6/13 | South Discharge | Al | 5.23 mg/L | 0.75 mg/L |

The above samples demonstrate violations of Effluent Limitation B(3). CSPA's and EDC's investigations, including their review of A-1 Metals' analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's Benchmark values and the State Board's proposed benchmark levels for specific conductivity, indicates that A-1 Metals has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, Specific Conductance, Chemical Oxygen Demand, Iron, Aluminum, Copper, and Lead in violation of Effluent Limitation

Notice of Violation and Intent To File Suit
October 6, 2014
Page 11 of 20

B(3) of the General Permit.  A-1 Metals was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations.  Thus, A-1 Metals is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

The above samples likewise demonstrate violations of Receiving Water Limitation C(2) of the General Permit, with respect to copper and lead, because such discharges cause or contribute to an exceedance of applicable water quality standards, in this case, the relevant CTR limits.  The above samples also demonstrate violations of Receiving Water Limitation C(1) of the General Permit, because such discharges adversely impact human health or the environment, and Discharge Prohibition A (2) because the discharges cause or threaten to cause pollution, contamination or nuisance.

CSPA and EDC are informed and believe that A-1 Metals has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least October 6, 2009.  CSPA and EDC allege that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since October 6, 2009, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit. Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA and EDC allege that A-1 Metals has discharged storm water containing impermissible levels of Total Suspended Solids, Specific Conductance, Chemical Oxygen Demand, Iron, Aluminum, Copper, and Lead in violation Effluent Limitation B(3), Discharge Prohibition A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing.  Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the General Permit and the Act. Each violation in excess of receiving water limitations and discharge prohibitions is likewise a separate and distinct violation of the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, A-1 Metals is subject to penalties for violations of the General Permit and the Act since October 6, 2009.

**B.      A-1 Metals Has Failed to Implement an Adequate Monitoring & Reporting Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Plan by no later than October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All

Notice of Violation and Intent To File Suit
October 6, 2014
Page 12 of 20

storm water discharge locations shall be sampled." Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon. Oil and grease may be substituted for total organic carbon. Section B(5)(c)(ii) of the General Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities." Section B(10) of the General Permit provides that "Facility operators shall explain how the Facility's monitoring program will satisfy the monitoring program objectives of [General Permit] Section B.2."

Based on their investigations, CSPA and EDC are informed and believe that A-1 Metals has failed to develop and implement an adequate Monitoring & Reporting Plan. As an initial matter, based on their review of publicly available documents, CSPA and EDC are informed and believe that A-1 Metals has failed to collect storm water samples during at least two qualifying storms events, as defined by the General Permit, during all five of the past five Wet Seasons. Second, based on their review of publicly available documents, CSPA and EDC are informed and believe that A-1 Metals has failed to conduct the monthly visual monitoring of storm water discharges and the quarterly visual observations of unauthorized non-storm water discharges required under the General Permit during the past two Wet Seasons. A1 Metals has also failed to employ adequate testing methods in violation of the General Permit.

Moreover, A-1 Metals has failed to analyze storm water samples for all required constituents. As a facility enrolled under SIC Code 5093 A-1 Metals must also analyze samples for Zinc. *See* Storm Water Permit, Section B(5)(c)(iii)*; id.* at Table D, Section N. It has failed to do so on every occasion that it sampled since October 6, 2009. Finally, based on their review of publicly available documents, CSPA and EDC are informed and believe that for two of the past five Wet Seasons, A-1 Metals has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility, including aluminum 0.75 mg/L ; oil & grease – 15 mg/L; mercury – 0.0024 mg/L; nickel – 1.417 mg/L; magnesium – 0.0636 mg/L; cadmium – 0.0159 mg/L.

Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the Clean Water Act, A-1 Metals is subject to penalties for violations of the General Permit and the Act since October 6, 2009. These violations are set forth in greater detail below.

> **1.    A-1 Metals Has Failed to Collect Qualifying Storm Water Samples During at Least Two Rain Events In All Five of The Last Five Wet Seasons, and Failed to Sample from All Required Discharge Points.**

Based on its review of publicly available documents, CSPA and EDC are informed and believe that A-1 Metals has failed to collect storm water samples from all

Notice of Violation and Intent To File Suit
October 6, 2014
Page 13 of 20

discharge points during at least two qualifying rain events at the Facility during each of the past five Wet Seasons, as required by the General Permit.  This is so, even though there were many qualifying storm events from which to sample (discussed further below).

In four of the past five Wet Seasons, A-1 Metals reported that the Facility sampled the first qualifying storm event of the season, when in fact it did not sample the first storm of the season during those four Wet Seasons.  For example, A-1 Metals reported in its 2009-2010 Annual Report that it sampled the first qualifying storm event of the Wet Season on December 7, 2009.  Based upon its review of publicly available rainfall data, CSPA and EDC are informed and believe that the first qualifying storm event of the 2009-2010 Wet Season occurred as early as Wednesday, October 14, 2009, when 0.32" of rain fell on the Facility.

In addition, A-1 Metals reported in its 2010-2011 Annual report that it only sampled from one qualifying storm event, even though there were numerous opportunities to sample such an event.  Further, in that same Annual Report, the storm event that A-1 Metals did sample was not a qualifying storm event.  Based on its review of publicly available rainfall data, CSPA and EDC are informed and believe that the storm that occurred at the Facility on February 18, 2011 was not a qualifying storm event because it rained 0.53" at the Facility on the day before.  Thus, the February 17, 2011 storm event rendered any storm occurring for three days afterwards non-qualifying. This failure to adequately monitor storm water discharges constitutes separate and ongoing violations of the General Permit and the Act.

Further, based on its investigation, CSPA and EDC are informed and believe that storm water discharges from the Facility at points other than the two sampling points currently designated by A-1 Metals.  These failures to adequately monitor storm water discharges constitute separate and ongoing violations of the General Permit and the Act.

## 2. A-1 Metals Has Failed to Conduct the Monthly Wet Season Observations of Storm Water Discharges Required by the General Permit.

The General Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)."  General Permit, Section B(4)(a).  As evidenced by the entries on Form 4 Monthly Visual Observations contained in A-1 Metals' Annual Reports for five of the last five Wet Seasons, CSPA and EDC are informed and believe that A-1 Metals has failed to comply with this requirement of the General Permit.

Specifically, A-1 Metals failed to conduct monthly visual observations of discharges from qualifying storm events for all months during five of the past five Wet Seasons as required by the General Permit.  Instead, A-1 Metals either completely failed to document visual observations at all, or documented its visual observations of storm

Notice of Violation and Intent To File Suit
October 6, 2014
Page 14 of 20

water that discharged during non-qualifying storm events during five of the past five Wet
Seasons.  However, based on publicly available rainfall data, CSPA and EDC are
informed and believe that there were many qualifying storm events during each of these
Wet Seasons that A-1 Metals could have observed.

For example, A-1 Metals reported in its 2013-2014 Annual Report that it did not
observe a discharge or there was no rain during the entire Wet Season.  Based on its
investigation of publicly available rainfall data, CSPA and EDC are informed and believe
that this could not be possible because there were numerous significant rainfall events
during those months.  *See* Attachment A.  A-1 Metals' failure to conduct this required
monthly Wet Season visual monitoring extends back to at least October 6, 2009, and has
caused and continues to cause multiple, separate and ongoing violations of the General
Permit and the Act.

**3.      A-1 Metals' Failure to Employ Adequate Testing Methods in
          Violation of the General Permit Since October 6, 2009.**

Additionally, A-1 Metals is in violation of the General Permit's requirement that
the testing method employed in laboratory analyses of pollutant concentrations present in
storm water discharged from the Facility be "adequate to satisfy the objectives of the
monitoring program."  General Permit Section B.10.a.iii.  The Regional Board has
determined the appropriate laboratory test methods to employ when analyzing storm
water samples for the presence and concentration of various pollutants, as well as the
appropriate detection limits for those testing methods.

However, in every single annual report filed by A-1 Metals, in four of the past
five years, the test methods and detection limits employed by the laboratory utilized by
A-1 Metals to analyze the concentration of the pollutants present in the storm water
discharged from its Facility did not comply with the Regional Board requirements.  For
example, the testing method A-1 Metals was required to apply for lead, aluminum, and
iron was EPA 200.8 with a detection limit of 0.0005.  However, in the annual report filed
by A-1 Metals in 2009-2010 the laboratory utilized test method EPA 6020 with detection
limits of 0.001, 1, and 0.0025 respectively.  Further, in the annual report filed by A-1
Metals in 2012-2013, the detection limits for aluminum and iron were above the required
detection limits by at least an order of magnitude.  These are just a few of many examples
of A-1 Metals' failure to adequately test the presence and concentration of pollutants at
their storm water discharge points

A-1 Metals is in violation of the General Permit for failing to employ laboratory
test methods that are adequate to, among other things, "ensure that storm water
discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and
Receiving Water Limitations specified in this General Permit."  General Permit, Section
B.2.a. ("Monitoring Program Objectives").

Notice of Violation and Intent To File Suit
October 6, 2014
Page 15 of 20

CSPA and EDC are informed and believe that publicly available documents demonstrate A-1 Metals' consistent and ongoing failure to implement an adequate Monitoring and Reporting Program in violation of Section B of the General Permit. Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, A-1 Metals is subject to penalties for these violations of the General Permit and the Act since October 6, 2009.

### 4. A-1 Failure to Analyze Storm Water Samples for All Required Constituents.

Moreover, A-1 Metals has failed to analyze storm water samples for all required constituents. Specifically, it has failed to ever analyze samples for Zinc, as required for facilities enrolled under SIC Codes 5093. *See* Storm Water Permit, Section B(5)(c)(iii)*; Id. at* Table D, Section N.  It has failed to do so on every occasion that it sampled since October 6, 2009.

In addition, CSPA and EDC are informed and believe that for two of the past five Wet Seasons, A-1 Metals has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility, including aluminum 0.75 mg/L ; oil & grease – 15 mg/L; mercury – 0.0024 mg/L; nickel – 1.417 mg/L; magnesium – 0.0636 mg/L; and cadmium – 0.0159 mg/L.

Each failure to sample for all required constituents is a separate and distinct violation of the General Permit and Clean Water Act.  Accordingly, A-1 Metals is subject to penalties for these violations of the General Permit and the Act since October 6, 2009.

### C. A-1 Metals Has Failed to Implement BAT and BCT.

Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  CSPA's and EDC's investigations, and the Facility's exceedances of EPA benchmarks explained above, indicate that A-1 Metals has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids, Specific Conductance, Chemical Oxygen Demand, Iron, Aluminum, Copper, and Lead and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

To meet the BAT/BCT requirement of the General Permit, A-1 Metals must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility.  Based on the limited information available regarding the internal structure of the Facility, CSPA and EDC believe that at a minimum A-1 Metals must improve its housekeeping practices, store materials that act as pollutant

Notice of Violation and Intent To File Suit
October 6, 2014
Page 16 of 20

sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether.  A-1 Metals has failed to adequately implement such measures.

A-1 Metals was required to have implemented BAT and BCT by no later than October 1, 1992.  Therefore, A-1 Metals has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that it fails to implement BAT and BCT.  A-1 Metals is subject to penalties for violations of the General Permit and the Act occurring since October 6, 2009.

**D.     A-1 Metals Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the General Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the Facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the Facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure

Notice of Violation and Intent To File Suit
October 6, 2014
Page 17 of 20

effectiveness and must be revised where necessary (General Permit, Section A(9),(10)). Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's and EDC's investigations and reviews of publicly available documents regarding conditions at the Facility indicate that A-1 Metals has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above. A-1 Metals has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Accordingly, A-1 Metals has been in continuous violation of Section A(1) and Provision E(2) of the General Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP. A-1 Metals is subject to penalties for violations of the General Permit and the Act occurring since October 6, 2009.

**E.     A-1 Metals Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards. Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.

The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard. Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance. *See also* Provision E(6). Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, A-1 Metals is discharging elevated levels of Total Suspended Solids, Specific Conductance, Chemical Oxygen Demand, Iron, Aluminum, Copper, and Lead and other unmonitored pollutants that are causing or contributing to exceedences of applicable water quality standards. For each of these pollutant exceedences, A-1 Metals was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Notice of Violation and Intent To File Suit
October 6, 2014
Page 18 of 20

Based on CSPA's and EDC's review of available documents, A-1 Metals was aware of high levels of these pollutants long before October 6, 2009. Likewise, A-1 Metals has generally failed to file reports describing its non-compliance with the General Permit in violation of Section C(11)(d). A-1 Metals has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Permit every day since October 6, 2009, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs. A-1 Metals is subject to penalties for violations of the General Permit and the Act occurring since October 6, 2009.

**F.      A-1 Metals Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10). Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit. *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's and EDC's investigations indicate that A-1 Metals has submitted incomplete Annual Reports and purported to comply with the General Permit despite significant noncompliance at the Facility. For example, A-1 Metals reported in four Annual Reports filed for the past four Wet Seasons (i.e., 2009-2010, 2010-2011, 2011-2012, and 2012-2013) that it observed storm water discharges occurring during the first storm of those Wet Seasons. However, as discussed above, based on their review of publicly available rainfall data, CSPA and EDC believe this is incorrect.

Further, A-1 Metals failed to sample from qualifying storm events in four out of the six storm water samples collected during the last five Wet Seasons. In the 2013-2014 Annual Report, A-1 Metals did not provide any sampling data whatsoever. A-1 Metals also failed to comply with the monthly visual observations of storm water discharges requirement for five of the past five Annual Reports filed for the Facility. For example, in the 2012-2013 Annual Report, A-1 Metals did not observe discharge from any qualifying storm events in the months of December and March, even though there were numerous qualifying storm events to observe.

These are but a few examples of how A-1 Metals has failed to file completely true and accurate reports. As indicated above, A-1 Metals has failed to comply with the Permit and the Act consistently for the past four years; therefore, A-1 Metals has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time A-1 Metals submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past five years. A-1 Metals' failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act. A-1 Metals is subject to

Notice of Violation and Intent To File Suit
October 6, 2014
Page 19 of 20

penalties for violations of Section (C) of the General Permit and the Act occurring since October 6, 2009.

**IV.     Persons Responsible for the Violations.**

CSPA and EDC put Michael Thompson, Sheryl Thompson, A-1 Metals & Auto Salvage, and A-1 Metals & Auto Salvage, Inc. on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA and EDC puts Michael Thompson, Sheryl Thompson, A-1 Metals & Auto Salvage, and A-1 Metals & Auto Salvage, Inc. on formal notice that it intends to include those persons in this action.

**V.      Name and Address of Noticing Parties.**

The name, address and telephone number of each of the noticing parties is as follows:  California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067; Environmental Defense Center, Owen Bailey, Executive Director; 906 Garden Street, Santa Barbara, CA 93101; Phone: (805) 963-1622.

**VI.     Counsel.**

CSPA and EDC have retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
Megan Truxillo
John J. Prager
Law Offices of Andrew L. Packard
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel. (707) 763-7227
Email: Andrew@PackardLawOffices.com
Attorneys for CSPA

Maggie Hall
Brian Segee
Environmental Defense Center
906 Garden Street
Santa Barbara, CA 93101
Tel. (805) 963-1622
Email: Mhall@environmentaldefensecenter.org
Attorneys for EDC

Notice of Violation and Intent To File Suit
October 6, 2014
Page 20 of 20

**VII.    Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects Michael Thompson, Sheryl Thompson, and A-1 Metals & Auto Salvage to a penalty of up to $37,500 per day per violation for all violations occurring during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA and EDC will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA and EDC believe this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against Michael Thompson, Sheryl Thompson,  A-1 Metals & Auto Salvage, and A-1 Metals & Auto Salvage, Inc and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

Owen Bailey, Executive Director
Environmental Defense Center

Notice of Violation and Intent To File Suit
October 6, 2014

## SERVICE LIST

Gina McCarthy, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Thomas Howard, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Kenneth A. Harris, Jr., Executive Officer
Regional Water Quality Control Board
Central Coast Region
895 Aerovista Place, Suite 101
San Luis Obispo, CA 93401-7906

**ATTACHMENT A**
**Notice of Intent to File Suit, A-1 Metals & Auto Salvage**
**Significant Rain Events,* October 6, 2009 – October 6, 2014**

| | | |
|---|---|---|
| Oct 10 2009 | Nov 20 2010 | Mar 25 2012 |
| Oct 13 2009 | Nov 21 2010 | Mar 31 2012 |
| Oct 14 2009 | Dec 5 2010 | Apr 10 2012 |
| Oct 19 2009 | Dec 17 2010 | Apr 12 2012 |
| Dec 3 2009 | Dec 18 2010 | Apr 13 2012 |
| Dec 7 2009 | Dec 19 2010 | Apr 25 2012 |
| Dec 10 2009 | Dec 20 2010 | Nov 17 2012 |
| Dec 11 2009 | Dec 21 2010 | Nov 28 2012 |
| Dec 12 2009 | Dec 22 2010 | Nov 30 2012 |
| Dec 27 2009 | Dec 28 2010 | Dec 2 2012 |
| Dec 30 2009 | Dec 29 2010 | Dec 12 2012 |
| Jan 13 2010 | Jan 1 2011 | Dec 22 2012 |
| Jan 17 2010 | Jan 2 2011 | Dec 23 2012 |
| Jan 18 2010 | Feb 14 2011 | Dec 25 2012 |
| Jan 19 2010 | Feb 16 2011 | Dec 29 2012 |
| Jan 20 2010 | Feb 17 2011 | Jan 6 2013 |
| Jan 21 2010 | Feb 18 2011 | Jan 24 2013 |
| Jan 22 2010 | Feb 19 2011 | Feb 8 2013 |
| Jan 26 2010 | Feb 25 2011 | Feb 19 2013 |
| Feb 4 2010 | Mar 2 2011 | Mar 6 2013 |
| Feb 5 2010 | Mar 18 2011 | Mar 7 2013 |
| Feb 6 2010 | Mar 19 2011 | May 6 2013 |
| Feb 9 2010 | Mar 20 2011 | Nov 20 2013 |
| Feb 19 2010 | Mar 21 2011 | Feb 2 2014 |
| Feb 21 2010 | Mar 23 2011 | Feb 6 2014 |
| Feb 24 2010 | Mar 24 2011 | Feb 26 2014 |
| Feb 26 2010 | Apr 7 2011 | Feb 28 2014 |
| Feb 27 2010 | May 15 2011 | Mar 1 2014 |
| Mar 3 2010 | May 16 2011 | Mar 29 2014 |
| Mar 13 2010 | May 17 2011 | Mar 31 2014 |
| Apr 4 2010 | May 18 2011 | Apr 1 2014 |
| Apr 5 2010 | June 4 2011 | Apr 2 2014 |
| Apr 11 2010 | June 5 2011 | Apr 4 2014 |
| Apr 12 2010 | June 6 2011 | |
| Apr 20 2010 | Oct 5 2011 | |
| Apr 21 2010 | Oct 6 2011 | |
| Apr 27 2010 | Nov 4 2011 | |
| May 18 2010 | Nov 6 2011 | |
| Oct 5 2010 | Nov 11 2011 | |
| Oct 6 2010 | Nov 12 2011 | |
| Oct 29 2010 | Jan 21 2012 | |
| Nov 7 2010 | Mar 17 2012 | |
| Nov 8 2010 | Mar 24 2012 | |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.